# Preliminary Expert Report of Andrew Tallmer

This is a preliminary expert report on the death of Vincent T. Burton ("Burton"). If I am provided with additional materials this report may be amended.

## SUMMARY OF QUALIFICATIONS

1. I am an attorney licensed to practice law in North Carolina since 1995. I am a retired member of the New York State Bar (admitted to that jurisdiction in 1986). I am a 1986 graduate of Albany Law School, and I received my undergraduate degree from Union College (N.Y.)
2. I am the owner of Andrew Tallmer Consultants, LLC. We provide legal training and advice to North Carolina law enforcement officers and agencies. Courses I teach include civil liability for patrol and supervisors, search and seizure, and arrest procedures. I teach a 76-course titled "Police Law Institute" which covers all major Fourth, Fifth, Sixth, and Fourteenth Amendments issues of concern to law. enforcement personnel. I have taught this course since 1995. Between New York and North Carolina, I have provided instruction to thousands of police officers and deputy sheriffs. Our website is LEOLAT.com (Law Enforcement Officer Legal Advice and Training).
3. I provide legal seminars to attorneys requiring CLE credit. Seminar topics include legal updates on recent United States Supreme Court cases in criminal law and procedure.
4. I have served as a police attorney for the New York City Police Department where responsibilities included providing legal instruction to NYCPD personnel in areas including civil liability and the law of force, both deadly and non-deadly.
5. I have worked as a legal instructor for the State of North Carolina, North Carolina Justice Academy. While at the Justice Academy I developed and taught law courses for North Carolina police personnel.
6. I am a former law professor and Dean of Faculty. I have taught criminal law and procedure to first and second-year law students.
7. I am a former Assistant District Attorney (Nassau County, New York).
8. I have extensive experience providing legal opinions in areas including the legal requirements and standards for use of force.
9. My experience and background is more fully described in my resume, attached hereto.
10. My area of expertise is civil liability, search and seizure, and the law of confessions.
11. I have reviewed the following materials in producing this report:
    - Hawaii Police Department Annual Arrest Control Techniques (COH 002120)
    - Hawaii Police Department Arrest Policy (GO 606)
    - Hawaii Police Department reports concerning Burton matter.
    - Federal Bureau of Investigation reports concerning Burton matter.
    - Plaintiffs' COMPLAINT
    - Defendants' ANSWER
    - Hawaii Police Department Annual Electrical Weapon Use Update (COH 2174)

- Hawaii Police Department Use of Force Policy (GO 804)
- Coroner's Inquest Report, Detective Kerr, May 20, 2018
- Autopsy Report, Vincent T. Burton, May 25, 2018
- Hawaii Fire Department/EMS Incident Report, May 4, 2018
- Relevant case law from the Ninth Circuit and other federal circuits
- AELE Law Journal Article on Use of Handcuffs, AELE Mo. L.J. 101 (2008).
- Hawaii statutes including Title 37, Section 703-307, Use of Force in Law Enforcement

**SUMMARY OF FINDINGS:**

- Defendants' use of force in making the arrest of Burton was objectively unreasonable.
- Defendants' use of a taser during the arrest of Burton was objectively unreasonable.
- Defendant's use of force against Burton while he was handcuffed was objectively unreasonable.
- The police reports concerning the incident do not provide a full accounting of the events and thus the defendants' explanation of what happened should be questioned.
- Burton's injuries and death were caused by the unreasonable use of force.

**FACTUAL BACKGROUND:**

- On the evening of May 3, 2018, Vincent T. Burton and his wife, Donna, were driving around Hawaii Island 23.
- Vincent T. Burton pulled over behind a police vehicle expecting the police officer to be a friend named Lani Merrick, a police officer from the Kohala area. The person in the police vehicle was, however, police officer Landon Takenishi.
- Defendant Takenishi got out of his vehicle to talk to Burton, at which point, Burton drove his truck away from the scene, against Takenishi's commands.
- Burton drove to a gas station in Honokaa at which point 3 to 4 police officers came up to talk to him. Among the officers that arrived were Defendant Luke Watkins and Defendant Paul T. Isotani.
- After Burton was administered the SFST tests, he was handcuffed with his hands behind his back.
- According to Burton's wife, Donna, one of the officers attacked Vincent Burton first, after he was handcuffed, and then Defendant Watkins also joined in on the beating.
- Burton ended up on the ground. After Burton shouted for Donna to record the situation, the Defendants stopped their assaults and took Burton away.
- One of the Defendants commanded Donna to get out of the truck and walk to a church nearby.
- Burton was taken into custody and was transported to the Hamakua Police Station.

- When the transport vehicle arrived at the station, Burton shifted his body to get out of the vehicle, Defendant Watkins interpreted Burton's actions as him trying to escape.
- Defendant Watkins then threw Burton onto the ground in and effort to subdue an already handcuffed suspect.
- In the early morning of May 4, 2018, Burton was transferred to Hilo Community Correctional Facility (HCCC) to await trial. During the transfer, Burton overheard one of the officers mention that "[they] better take [Burton] to the Hilo Hospital so [they] don't get blamed [for the injuries]."
- Before Burton was taken to HCCC, the police officers from the Hilo station took Burton to the Hilo Medical Center (HMC).
- HMC later called and left a message on Donna's phone stating that "[Plaintiff Burton had] broken ribs and a concussion."
- Burton was discharged into the custody of the Hilo police officers and was transported to HCCC.
- On May 8, 2018, the charge against Burton of escaping custody was dismissed.
- On the evening of May 8, 2018, Plaintiff Lerette, Burton's sister, bailed him out of custody.
- Within forty-eight (48) hours of Burton's release from custody, he vomited blood and was taken to the HMC Emergency Department by EMS.
- Burton was admitted into HMC from May 11, 2018, until May 20, 2018 when he died.
- Upon the physical examination at or around 7:57 a.m. on May 11, 2018, a large, 30 x 10 cm, hematoma was discovered on the left flank, very tender to palpation. Additionally, a photograph of Vincent T. Burton's hematoma while he was in the hospital showed four (4) small round indentations in the middle of the hematoma, which is believed to be the result of Burton being tasered twice.
- Dr. Cedar ordered chest x-ray, CT scan for the chest with contrast and CT scan for the abdomen and pelvis with contrast. The impression from the chest x-ray showed "new bilateral pleural effusions, moderate on the left and small on the right." The CT scan of the chest with contrast showed impression of: (1) left posterior seventh and eighth and ninth rib fractures, and (2) left greater than right loculated pleural effusions with adjacent compressive atelectasis/consolidation.
- The CT scan of the abdomen and pelvis with contrast had the following impressions: (1) marked distention of the stomach. Cannot exclude gastric outlet obstruction or gastroparesis, and (2) acute fractures of the left eighth and ninth ribs.
- 
   Burton was diagnosed with lactic acidosis, acute respiratory failure with hypoxia, acute blood loss anemia, bilateral pleural effusion, thrombocytopenia, upper gastrointestinal bleed, and acute renal failure.
- On or around May 14, 2018, Curtis Lee, MD (Dr. Lee) notated generalized anasarca. On or around May 16, 2018, generalized jaundice was also noted.
- Burton received hemodialysis on May 17, May 18, and May 19, 2018.

- On or about May 19, 2018, to May 20, 2018, overnight, Burton needed maximum dosages of Levophed and Dopamine with no signs of improvement for his BP and MAP. His LFTs and Creatinine became worse. Burton was also exhibiting signs of coagulopathy. Plaintiffs opted for terminal extubation. Burton was extubated and expired at 9:50 a.m. on May 20, 2018.
- The immediate cause of death recorded in the Death Summary Report from HMC was multiorgan failure from MSSA sepsis.
- The City Medical Examiner ruled the manner of death was homicide. Burton's death was: (a) sepsis and multiorgan failure, and (b) subacute rib fractures.

**DEFENDANTS' USE OF FORCE AGAINST BURTON WAS OBJECTIVELY UNREASONABLE**

1. The leading United States Supreme Court case on the use of force is *Graham v. Connor,* 490 U.S. 386 (1989). Claims of excessive force are to be decided upon the Fourth Amendment requirement that police seizures of suspects are to be reasonable. In determining reasonableness, courts are to balance the nature and quality of the force used against an individual's right to be free from excessive force. In short, the government's interest in seizing a suspect is to be weighed against the suspect's right not to be a victim of unreasonable force. To strike the balance, the court is to look at the totality of the circumstances including the severity of the crime under investigation, whether the suspect poses and imminent threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. In effecting seizures, Officers must also follow state law and department policy.
2. Excessive force is an officer's use of more force than is reasonably necessary under the circumstances. The determination of excessive force is to be judged using an objective standard, that is, more force was employed than a reasonable and prudent officer would use under the circumstances.
3. Determinations of objective reasonableness cannot be made in a vacuum, that is, they must consider all the circumstances known to the officers at the time of the incident. The standard for evaluating the use of force acknowledges that officers are often forced to make split-second judgments in tense, uncertain circumstances. The reasonableness of the use of force must be judged from the perspective of a reasonable officers on the scene, not with hindsight vision.
4. The officer's intent and motivation in using force is not relevant. If the amount of force used was reasonable, it does not matter whether the officer's intentions were bad. But the reverse is true as well: if the officer had the best of intentions but the forced used was objectively unreasonable, the excessive force claim is viable.
5. In a recent Ninth Circuit case on the use of force, the Court indicated as follows: "[a]llegations of excessive force during an investigatory stop or arrest of a free citizen are examined under the Fourth Amendment's prohibition against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989); see also Garner, 471 U.S. at 7. This is an objective inquiry that asks whether an officer's actions were reasonable in light of the circumstances he confronted. Graham, 490 U.S. at 397. Determining whether a particular use of force was reasonable "requires a careful balancing of the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal quotation marks and citation omitted). To assess the government interests, we evaluate a "range of factors" that include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others (3) whether he was actively resisting arrest or attempting to evade arrest by flight, and any other exigent circumstances that existed at the time of the arrest." *Villanueva v. California,* 986 F. 3d. 1158 (2021).

6. The Hawaii Police Department incident report of May 4, 2018 reflects that Burton was 57 years old. was six feet tall and weighed 160 pounds. He was arrested for driving while intoxicated. While defendant Watkins was taking Burton out of the patrol car, Burton's handcuffed hands were in front of his body. Presumably Burton had originally been "back cuffed". The report reflects that Burton shoved Watkins after which Watkins brought Burton to the ground by way of a "bearhug" followed by sweeping Burton off his feet. The report shows that both Burton and that Watkins received minor abrasions and that Watkins had pain in his chest because of being pushed.
7. The documents I have reviewed does not indicate the relative sizes of Watkins and Burton. I have, though, viewed pictures of both parties and it appears that there is not a significant height and weight difference between the two men.
8. The autopsy report dated May 25, 2021, reflects that Burton had five rib fractures: on the left side, ribs 6.7.8. and 9; on the right side, rib number 8. The autopsy also indicates that Burton had a large healing cutaneous contusion on the left lateral torso.
9. The Coroner's Inquest report of Detective Kerr indicated that FBI Agent Vallieres was present at the autopsy. She asked Dr. Harle if the rib injuries were consistent with Burton being kicked in the back Dr. Harle opined that while this was possible Burton's bruising were more consistent with another person lying on top of Burton.
10. The autopsy report concludes that Burton's death was a homicide due to sepsis secondary to rib fractures.
11. The documents I have reviewed do not indicates that the injuries just above were present prior to the arrest of Burton by Watkins and the other officers involved. It is thus reasonable to conclude that the broken ribs and torso injury were suffered when Burton was placed in a bearhug and swept to the ground by Watkins. This is consistent with Watkin's report in which he indicates that both men fell on their left sides.
12. The Police Department incident report of May 4, 2018 does not mention that any of the officers kicked or lay on top of Burton.
13. The Coroner's Inquest report prepared by Detective Kerr on May 20, 2018, indicates the following: "Officer WATKINS stated that he grabbed ahold of the male party and they both fell to the ground. He stated that he had him in a bear like type of hold and he stated that they were both facing in the same direction, and they fell onto their left side."
14. In my view the reports prepared by the Hawaii Police Department do not sufficiently detail the incident to explain Burton's broken ribs and bruised torso. Assuming the injuries were caused by police action, that level of force would not be justified. There is no indication in the reports that Burton presented an imminent threat to Watkins or the other officers.

15. The Hawaii Police Department Arrest Policy, section 5.5.3 requires that when force is used, information regarding the use of force shall be included in the arrest report (October 27, 2014 version). This means that **all** use of force should be documented.
16. Assuming Burton had been back cuffed when placed under arrest, it would be reasonable for officers to be concerned that Burton was able to move his hands to the front of his body. The records do not reflect, however, that Burton was reaching for a weapon or was in some other way causing an imminent threat. It is my opinion that the officers could have re-handcuffed Burton without resorting to a bear hug, leg sweep, or lying on top of Burton.
17. The Hawaii Police Department's Annual Arrest Control Techniques Refresher (COH 002104) includes instructions on Arm Bar Take Down, Wrist Out Turn Take Down, and High-Risk Kneeling/Handcuffing. The Refresher does not indicate whether "bear hold" takedowns. If such holds are authorized, the Department should instruct officers on the situations in which this use of force is justified.
18. In *Polk v. Hopkins*, 129 Fed. Appx. 285 (Unpub. 6th Cir. 2005), the court found that, while a police officer had adequate probable cause to arrest a motorist for reckless driving after observing her going 76 miles per hour in a 45 mile per hour zone, genuine issues as to whether he improperly used excessive force against her after she was handcuffed, jerking her up by the handcuffs in a manner severe enough to cause a disabling injury. This barred summary judgment for the officer. Under the circumstances presented, the court concluded, there was a jury question as to whether the force used was reasonable, including those that allegedly took place after plaintiff was already handcuffed. Once the motorist was flat on the ground, the court commented, and especially once she was handcuffed, "there was no evidence" that she presented a threat to the officer or to anyone else.
19. In the Burton matter, the police used unnecessary force on Burton after he had been handcuffed. Since Burton had already been handcuffed, any necessary search for weapons could have been conducted.
20. In *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988), the court ruled that when the arrestee was handcuffed and that he was not trying to escape or to hurt anyone, there was no need for the police to apply force.
21. The reports reflect that Burton's blood alcohol content was above the legal limit. While a suspect's impairment is a factor the officers may consider in determining the proper amount of force to be used, the suspect's intoxication does not in and of itself indicate that he is a present threat. The reports do not show that Burton said anything threatening to the police.
22. While it is unacceptable for anyone to shove a police officer, the amount of force used in response to that contact shove must be proportionate to the possible harm. The tactics used to subdue Burton after the shove were above those reasonably necessary to protect the officers from further unwelcome contact. I note that Watkins had other use of force options available to him such as pepper spray. Authorization to use pepper spray is set forth in the Hawaii Police Department use of force guidelines dates August 26, 2016.
23. The Hawaii Police Department Arrest Policy, section 5.5.2 indicates that no person shall be subjected to more restraint than is necessary and proper for the arrest and detention. It is my opinion that the policy requirements were not followed in the Burton incident.

24. On May 11, 2018, Burton went to HMC. Upon the physical examination by Dr. Cedar at or around 7:57 am, a large, 30 x 10 cm, hematoma was discovered on the left flank, very tender to palpation. Additionally, a photograph of Vincent T. Burton's hematoma while he was in the hospital showed four (4) small round indentations in the middle of the hematoma, which is believed to be the result of Burton being tasered twice.
25. Hawaii Police Department personnel are trained in the proper use of the taser. The Taser Annual Controlled Electrical Weapon User Update (COH 002174) contains in part: "National Institute of Justice 5-year Study of Deaths Following Electro Muscular Disruption (2011) (available at www.ncjrs.gov/pdffiles1/nij/233432.pdf) found that TASER CEW deployment "has a margin of safety as great or greater than most alternatives," and carries a "significantly lower risk of injury than physical force." A PERF study (2010) found agencies using CEWs decreased suspect injuries requiring medical attention by 45% and decreased officer injuries requiring medical attention by 80%."
26. The Taser User Update also indicates: "If no exigency or immediate safety risk exists, slow down and consider alternative force options/solutions including negotiation, commands, or physical skills Do not immediately resort to CEW. Physical resistance or mental illness alone does not indicate immediate threat. Choose a force option reasonably likely to cure the immediate safety risk. Use CEW only on those "actively resisting" or higher".
27. Burton's actions do not rise to the level of exigent circumstances or an immediate safety risk. The use of the taser was thus not an appropriate use of force.
28. In *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), the court wrote: [d]eadly force cases pose a particularly difficult problem… because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story--the person shot dead--is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. Hopkins, 958 F.2d at 885-88; *Ting v. United States*, 927 F.2d 1504, 1510-11 (9th Cir.1991). In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably.
29. *Hopkins v. Andaya*, 958 F.2d 881, 885 (9th Cir. 1992) is also instructive. "It is true that only Andaya's first-hand testimony was presented. However, circumstantial evidence can speak clearly and often unequivocally; properly construed, it is as objective and reliable as any other evidence. As a great trial lawyer once said, "We better know there is a fire whence we see much smoke rising than we could know it by one or two witnesses swearing to it. The witnesses may commit perjury, but the smoke cannot." Abraham Lincoln, Unsent Letter to J.R. Underwood and Henry Grider, October 26, 1864, reprinted in The Quotable Lawyer 323 (1986) (Schrager and Frost eds.) ..."
30. Vincent Burton is deceased. His wife did not witness the events leading up to her husband's death. The court in the instant case should thus review the police reports and

physical evidence carefully to ensure that there are no inconsistences or self-serving accounts.

**CONCLUSION**

It is my opinion that the force used to effect the arrest of Burton was objectively unreasonable, excessive, and inconsistent with department policy. The amount and type of force used against Burton while he was handcuffed was unreasonable.  The use of the taser against Burton was not objectively reasonable. The police reports concerning the use of force are not consistent with the injuries suffered by Burton. A reasonable jury could find that the reports were incomplete because of a police desire to withhold certain key facts concerning the amount of force used against Burton. A reasonable jury could find that excessive force by the police caused the death of Burton.

Respectfully submitted,

*Andrew Tallmer*

August 28, 2021